**In re The WHITE MOTOR CREDIT CORPORATION, White Motor Corporation, Gemini Mfg. Co., White Motor Corporation of Canada Limited, the White Motor Credit Corporation of Canada Limited, Debtors.**

**Bankruptcy No. B80–3360.**

United States Bankruptcy Court, N. D. Ohio.

May 18, 1981.

---

## MEMORANDUM ORDER

MARK SCHLACHET, Bankruptcy Judge.

Motion under Bankruptcy Rule 805 for Stay of Order Appointing Special Master for Disposition of Product Liability Claims. *Denied.*

### BACKGROUND

The White Motor Corporation [hereinafter "Motor"] and five affiliates filed reorganization proceedings pursuant to Chapter 11 of the Bankruptcy Reform Act of 1978, Pub.L.No.95–598, 92 Stat. 2549 (1978), 11 U.S.C. § 101 et seq. [hereinafter the "Code"] on September 4, 1980. The debtors' gross sales for the year ended December 31, 1979 exceeded $1.2 billion. The parent, *i. e.*, Motor, had 1979 sales of $809,300,000, while the White Farm Equipment Co. [hereinafter "Farm"] experienced sales of $401,700,000. Measured in those terms, the White reorganization was the largest matter theretofore filed under the new Bankruptcy Code. Unsecured creditors of the parent are owed roughly $250,000,000.

Over the many years of operations, Motor has been named as defendant in numerous products liability suits. At the present time, there are 160 such suits pending in various state and federal courts nationwide against Motor, and there may exist unfiled claims of which Motor may or may not be cognizant. All such claims are contingent and unliquidated, and represent potential claims against the estate of the White Motor Corporation.

Many of the law suits involve multiple defendants, *e. g.*, Amoco Oil Company in *Leaphart v. White Motor Corp.*, currently pending in Fairfax, Virginia, discussed *infra*. In many instances while White is not the principal defendant. In no instance yet brought to the Court's attention, however, is White merely a nominal defendant. See *Hoffenberg v. Travelers Indemnity Co., (In re Stannco Developers Inc.)*, 534 F.2d 1050 (2d Cir. 1976). Some such actions have been pending for as long as eight years, while others are of more recent vintage. This implies that the actions are at varying stages of ripeness and development. The aggregate prayers in these actions run into many tens of millions of dollars. The plaintiffs in these actions include widows, whose status as such is alleged to have been occasioned by actionable offenses committed by Motor and co-defendants.

All of the products liability suits have been effectively stayed by operation of section 362 of the Code, 11 U.S.C. § 362(a). This section "operates [upon filing] as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before . . ." filing of the reorganization. 11 U.S.C. § 362(a)(1). Section 362 operates to stay as well the "employment of [any] process," *e. g.*, discovery request, preservation of testimony, seeking entry of judgment after a successful appeal, or service of process and joinder of parties thereby. Importantly, the stay operates as a windfall benefit to co-defendants and insurance companies who, along with the debtor, enjoy many of the benefits of the moratorium. Nevertheless, for many reasons (perhaps including section 362 itself), products liability plaintiffs cannot dismiss a reorganization debtor and proceed against co-defendants only. Actions taken in violation of the stay are without effect. *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940); *Potts v. Potts*, 142 F.2d 883, 888 (6th Cir. 1944), *cert. denied*, 324 U.S. 868, 65 S.Ct. 910, 89 L.Ed. 1423 (1945).

Relief from the stay, *i. e.*, permission to proceed with a case in another forum, is sought under section 362(d)–(e) of the Code and may be granted for "cause." In the Motor reorganization, fifteen complaints for relief from stay have been filed and numerous pretrials held thereon. At least five plaintiffs have sought relief by way of motion, which requests have been denied, without prejudice, for failure to comply with Bankruptcy Rules 712(b) and 741. Several plaintiffs have written letters to the Court and counsel in an effort to achieve relief— many times in an effort to do so without travelling to Cleveland. White has vigor-

ously opposed all such requests and, for numerous reasons, the Court on only one occasion has actually lifted the stay and permitted a products liability case to move toward conclusion.

The effect of lifting the stay would be to require debtor to defend against the 160 pending actions. Besides the expense of so defending, the debtor would not know for many years precisely what, if anything, it owes the products liability claimants. With an exposure of tens of millions of dollars, such delay could seriously impact upon the ability of the debtor or other entity to formulate and/or gain acceptance by creditors of a plan of reorganization; to that extent, the possibility of a successful reorganization—affecting creditors, employees, shareholders, pensioners, and others—becomes less likely and the prospects of liquidation enhanced.[1]

Conversely, should the claimants proceed in the many jurisdictions with the 160 pending actions, substantial uncertainty and chaos would clearly ensue. Insurance coverage is at present a subject which has and may continue to have serious implications for claimants. Beyond the $1.6 million in claims reserves being allegedly maintained by the Continental Insurance Company and applicable to claims against both Motor and Farm, there could be a question as to whether any coverage whatever exists and, if so, starting at what aggregate exposure to Motor. What impact and result from a less-than 100% distribution to creditors? Is there an exhaustible fund, thus precipitating a race to the courthouse and imparting to factors, wholly unrelated to justice itself, a critical importance? These and many other questions would plague claimants, debtor, other creditors, multitudinous courts, prospective acquirers and others if this Court were to grant relief from stay in the pending actions.

For many of the above reasons, debtor proposed at an early stage in this case to formulate a program for the overall disposition of claims [hereinafter "Program"]. The concept is rooted in section 502(c) of the Bankruptcy Code, providing:

(c) There shall be estimated for purpose of allowance, under this section—

(1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay the closing of the case;

11 U.S.C. § 502(c)(1). The program, in effect, would provide the vehicle for determining and resolving the claims.[2] Motor anticipated the appointment of a special master to assist in the formulation of the Program and conduct hearings on non-settled claims.

The concept and expectation of the Program provided the initial, though not principal, basis for continuing the section 362 stay in many of the cases where relief from the stay was sought. Many claimants agreed, notwithstanding support for their position under *Foust v. Munson S. S. Lines*, 299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49 (1936), to a continuation of the stay pending implementation of the Program. The typical understanding reached at section 362(d) preliminary hearings, with one attorney for the Official Creditors' Committee always in attendance, is conveyed in the following correspondence:

At that conference, I learned that a proposed procedure for handling product liability claims was soon to be forthcoming from White....

. . . .

If we receive a copy of White's proposed plan for the handling of products liability

---

1. Debtor has stated that White "cannot formulate an effective, acceptable plan of reorganization unless and until these contingent unliquidated claims are somehow fixed and liquidated." Proceedings of May 6, 1981, Hearing Transcript [hereinafter "M.H. Trans."] at 19.

2. The Court is confident that such a program can provide a complete remedy as to all parties and claims. Co-defendants may be joined to the action. *Diego v. Zamost (In re Zamost)*, 7 B.R. 859, 7 B.C.D. 34 (Bankr.Ct.S.D.Cal.1980); *Westinghouse Credit Corp. v. Yeary (In re Brothers Coal Co.)*, 6 B.R. 567, 6 B.C.D. 1066 (Bankr.Ct.W.D.Va.1980). Third parties are subject to impleader. *Young v. Soultan, Ltd. (In re Lucasa Int'l., Ltd.)* 6 B.R. 717, 6 B.C.D. 1172 (Bankr.Ct.S.D.N.Y.1980).

claims ... we shall, in line with your guidance at the pre-trial conference of April 8, 1981, study the plan and be prepared to discuss the advisability or non-advisability of its application to this particular case.

Letter dated April 30, 1981 of Leo V. Boyle, Esq., *Leaphart v. White Motor Corp.*, Case No. B81–0323 (Bank.Ct.N.D.Ohio filed Mar. 12, 1981). Thus, with the acquiescence of the committee representing all creditors, numerous plaintiffs have been advised that (1) a just and speedy resolution of their claims would be imminent, and (2) that such a program would have the assistance of a special master.[3] Indeed, special counsel have been retained to aid the debtor in the valuation of claims. Proceedings of April 22, 1981, Hearing Transcript [hereinafter "H. Trans."] at 34.

A special master is integral to the Program. M.H.Trans. at 20. First, the Court simply does not have the time to consider evidence of perhaps hundreds of damage claims. The White reorganization and the scores of proceedings spawned thereby occupy much of the Court's time on a daily basis.[4] Second, it would be inappropriate for the Court to address, on a massive basis, what are "matters of account and ... difficult computation of damages ...." *Cf.* F.R.Civ.P. Rule 53(b). Third, the master may, in appropriate circumstances upon application, be required to travel to the locality wherein the parties and witnesses reside. This may be only fair and just, as well as economical, in light of the movement of viable causes to this district.[5] Fourth, the appointment can only hasten the formulation of a plan. Thus, the master is truly part of a moulding process by which the necessities of each case are met, *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944), through the implementation of remedies which are fair and workable. *Cf. Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955).

In due course, an application requesting that a special master be appointed was brought on for hearing. Said application was included as one of the items on the agenda for White Order Day of April 22, 1981.

3. The contours of the Program and commitments thereto have been common knowledge for months. For example, on April 9, 1981, counsel for Motor prayed as follows:
We ask that the Court provide us with the ability to proceed on that program and not jeopardize our insurance coverage, our potential recoverability of assets from our insurance carrier, and consistent and equitable treatment of all of the various products cases.
Proceedings of April 9, 1981, Hearing Transcript at 12. Counsel for White Farm Equipment Co. provided assurances that a similar program for the Farm case would be proposed within 30 days. *Id.* at 17.

4. All are agreed on this point, as evidenced by the following remarks of appellant:
[T]his Court would be relieved, as it should be, in various aspects of this White case, which are deep and burdensome in regard to this complexity apart from this particular area of interest [*i. e.*, the claims].
M. H. Trans. at 45.

5. *See, e. g.*, Affidavit of Elva C. Leaphart, stating as follows:
1. That I am the surviving wife of Newton Bennie Leaphart, a/k/a Newton B. Leaphart, Jr., who died intestate on June 28, 1977.
. . . .

7. Since the death of my husband I have obtained employment with Ardmore Development Center as a busdriver of handicapped children, at a salary of $175.20 bi-weekly.
. . . .
9. The Workmen's Compensation benefits I receive represent about $1/3$ of our family's income in 1976. Even with the income derived from my employment our family income currently is only a portion of the family income we had in 1976.
. . . .
11. If the trial of the lawsuit referred to in paragraph 5 herein is held in Cleveland, Ohio, there will be an additional financial hardship to me and my children for additional expense of transportation and living expenses for the five of us to attend and testify at the trial. In addition, we will be responsible for paying similar expenses of expert and other witnesses to attend and testify. [The trial referred to in para. 11 is related to plaintiff's complaint for relief from stay, not a trial of the underlying products liability claim.]
Case No. B81–323 (Bankr.Ct.N.D.Ohio filed Mar. 12, 1981).

## THE HEARING—AN UNCONTESTED ORDER

A hearing on the debtor's application was duly held, as reported at pages 26–39 of the Hearing Transcript for April 22, 1981. The Official Creditors Committee, through its counsel, voiced support in principle for the program and the appointment, suggesting that "more than one individual" might be necessary to "dispose of these claims." H. Trans. at 31. The Committee's concerns that the appointment might be premature were countered by the debtor. The Court held for the debtor and announced the appointment, the appointee, and the reasons therefor. H. Trans. at 33–37. After that announcement, counsel for appellant, seated in the jury box and being one of three attorneys present and representing a consortium of twenty-seven banks, rose to speak:

> Mr. Patchan: Your Honor, may I inquire of the applicant's counsel the statutory basis for the Bankruptcy Court to appoint a special master?
>
> Ms. Riemer: I believe there is authority in Rule 513 of the Rules of Bankruptcy Procedure which incorporate Rule 53 of the Federal Rules of Civil Procedure.

H. Trans. at 38. With that explanation counsel took his seat and uttered not another word on the subject.

While the Court was, frankly, braced to consider the issue of a bankruptcy court's power to appoint a special master (the Court having previously reviewed 11 U.S.C. § 105 and 28 U.S.C. § 1481), counsel's demeanor, indicating that no serious questions existed, prompted the Court to move on to the other pressing matters. Indeed, the matter was so universally thought to have been concluded that, at the end of the agenda, counsel for the Official Creditors' Committee rose and initiated a discussion of alternative means of paying the special master. H. Trans. at 144–48. Appellant neither participated in that discussion nor brought any misgivings to the Court's attention.

One further point of fact merits citation, to wit: appellant, who is actually Citibank,[6] as agent for the consortium, is but one creditor of tens of thousands of creditors of White Motor Corporation. Among the hordes of creditors, all of whom are represented by the Official Creditors' Committee which supported debtor's application, are the injured claimants, other banks, large trade creditors, widows and children, pensioners, employees and others who might benefit from the Program.

## APPEAL AND MOTION FOR STAY

The appeal, accompanied by the instant motion for stay (Bankruptcy Rule 805), was filed on May 1, 1981 pursuant to conversations between Cleveland and New York counsel for Citibank.

The memorandum supporting appellant's motion addresses the Court's order of April 22, 1981 in a confusing manner. It presupposes that the Court ruled upon the faint suggestion of Mr. Patchan, half-heartedly addressed to debtor's counsel after the Court's oral order of appointment, that the Court lacked the statutory basis to so order. In fact, inasmuch as the matter seemed and was uncontested at the hearing itself, the Court merely adopted the reference to Bankruptcy Rule 513 as providing a sensible framework within which the master might operate. The Court did not address the issue of jurisdiction and power in any manner, express or implied.

With respect to Bankruptcy Rule 513, as learned counsel undoubtedly know, rules of procedure, to the extent inconsistent with the Code, have no application whatever. Title IV, Bankruptcy Reform Act of 1978, Pub.L. 95–598, 11 U.S.C. § 405(d); 28 U.S.C. § 2075, as amended by Code, § 247. Moreover, it is clear that during the transitional period (ending April 1, 1984), all pertinent provisions of the Code with respect to the Court's jurisdiction and powers (28 U.S.C. §§ 1471, 1481), as well as 11 U.S.C. § 105,

---

**6.** Counsel remarked on May 6, 1981, "I discussed the matter with my client and with co-counsel." M. H. Trans. at 29.

are in full force and effect. Code, § 405(a)(1)–(b). The Code took effect, generally, on October 1, 1979. Code, § 402(a). Bankruptcy Rule 513 is therefore patently beside the point.

Appellant's memorandum thus points up an element of mischief which should not go unnoticed on appeal; namely, an appellate court is asked to decide in the first instance matters which should have been addressed to the trial court.[7] In asking what appeared to be an academic question and acquiescing in counsel's response, counsel virtually invited a Court ruling adopting the applicant's proposed language and format. It has been said that "an appellant may not complain on appeal of errors which he himself induced or invited." *Neu v. Grant*, 548 F.2d 281, 287 (10th Cir. 1977). The record cannot support the proposition that appellant made known "his objection to the action of the court and his grounds . . . ." Fed.R.Civ.P. 46. In a case, as here, where

the Court has tentatively ruled, and even then the issue is barely mentioned, a motion for reconsideration might be the least which is required. *Cf. Seymour v. Coughlin Co.*, 609 F.2d 346, 348 (9th Cir. 1979). Finally, it has been held that failure to timely object to the appointment of a special master constitutes a waiver of such objection. *Reed Bros. Stone Co. v. Pittman Const. Co.*, 20 Tenn.App. 552, 555, 101 S.W.2d 478, 480 (Ct.App.1937).

Nevertheless, the important issue of this Court's power to issue the order in question may justify attention on appeal notwithstanding irregularities below. *Compare Glidden Co. v. Zdanok*, 370 U.S. 530, 535–36, 82 S.Ct. 1459, 1464–65, 8 L.Ed.2d 671 (1962), *with Maynor v. Morton*, 510 F.2d 1254, 1256 n.6 (D.C. Cir. 1975). Since likelihood of success on the merits of *that* question therefore bears critically upon the motion for stay, it is clearly appropriate to fully discuss the matter herein.[8]

7. Appellant asserts that it had inadequate notice of the application. M.H. Trans. at 29. In clarification, it should be understood that "White Order Day", at which miscellaneous "White" matters are considered, is scheduled every other week. Matters, (*i.e.*, those not otherwise subject to specific statutory or regulatory notice provisions) are placed on the agenda by circulation thereof to the 10 entities scheduled in the Court's Order of November 24, 1980. These 10 entities represent virtually all parties in interest. Service pursuant to the November 24th Order was made of the subject application. M.H. Trans. at 35.

> Moreover, no adjournment, continuance, rehearing or other appropriate measure by which Citibank could present and argue its views was sought.

8. Another question raised—this one for the first time at the May 6th hearing on motion for stay pending appeal—was the "necessity" (M. H. Trans. at 32–33) for the appointment. This issue, clearly raised for the first time on appeal, fits into none of the exceptions to the general rule precluding appellate review of issues not raised below. *Fontainbleau Hotel Corporation v. Gardner*, 639 F.2d 1274, 1276–77 (5th Cir. 1981).

If a reviewing court were to consider the matter, however, it is unlikely that the "clearly erroneous" standard, measured against the requirements of Civil Rule 53, could be met. *Slodov v. U. S.*, 552 F.2d 159, 162 (6th Cir. 1977), *rev'd on other grounds*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). Clearly, the issues involved in the formulation of the Program (having perhaps no antecedent) are necessarily complex. The numerous parties, their relationships, the newness of the Code and the paramount need for fairness make complications inevitable. At the same time, damages are invariably matters of account (e. g., lost income) and otherwise difficult to compute (e. g., pain and suffering, loss of consortium, et al.).

Taken alone, such cases are well within the Court's ability to dispatch. Taken by the hundreds, however, such claims create "exceptional conditions." Exceptional conditions likewise exist where one of the largest reorganization cases ever brought under Title 11 may well be derailed as such absent the Program, and the master is integral to the Program itself. See discussion, *supra*, at 297. The Examiner has indicated that should additional delays to claimants be encountered, the Court, "in fairness to these hundreds of claimants . . . must also lift the stays." M. H. Trans. at 41. This, too, is an exceptional condition. Indeed the dynamics of the present circumstances are such that the consequences, potentially devastating, of the Program's failure to both debtor and claimants are (1) difficult to foresee, and (2) impossible to measure.

In *In re Erie Lackawana Ry.*, Civ.No. 72–2838 (N.D.Ohio filed June 26, 1972), a special master to deal with claims was appointed without objection. See Letter of Hon. Harry Phillips, dated September 5, 1972, making designation pursuant to § 77(c)(13) of the Bankruptcy Act.

## THE LEGAL QUESTION

Appellant presents a question of statutory interpretation, namely, whether the bankruptcy court is empowered by the Bankruptcy Code to appoint a special master.

Most relevant to the issue is section 1481 of Title 28, United States Code, providing:[9]

A bankruptcy court shall have the powers of a court of equity, law, and admiralty
. . . .

It has been "a long standing practice of the federal courts, as described in *Ex Parte Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), of appointing 'persons unconnected with the court to aid judges in the performance of specific judicial duties.'" *Reed v. Cleveland Board of Education*, 607 F.2d 737, 743 n.1 (6th Cir. 1979). It thus seems quite clear that a bankruptcy court, exercising the jurisdiction and powers conferred by section 1481 viz-a-viz section 405(b) of the Code, is empowered to appoint a special master.

> The appointment of a special master is frequently deemed appropriate in complex reorganizations. *See, e. g., In re Manufacturers Trading Corp.*, 194 F.2d 961 (6th Cir. 1952); *In re American Bantam Car Co.*, 193 F.2d 616 (3d Cir. 1951); *Gochenour v. Cleveland Terminals Bldg. Co.*, 118 F.2d 89 (6th Cir. 1941).

**9.** Code, § 105 and 28 U.S.C. § 1481 clearly overlap. The former is modeled after § 2(a)(15) of the Bankruptcy Act, while the latter, seemingly occasioned by extension of bankruptcy court jurisdiction to civil proceedings "arising in" or "related to" cases under Title 11, provides the powers of an admiralty court. The non-settled products liability claims to be estimated through the hearing process, over which the bankruptcy court has non-exclusive jurisdiction (28 U.S.C. § 1471(b)) are in the nature of adversary or contested proceedings rather than matters integral to the administration of the debtor's affairs, *e. g.*, appointment of officers, confirmation of plan, reopening a case. See House Report No. 95–595, 95th Cong., 1st Sess. [hereinafter "H.Rep."] 445 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. The Court will therefore address itself to 28 U.S.C. § 1481, although section 105 of the Code, which expressly includes the important power of final judgment and embraces as well appointive powers (§ 105(b)), appears equally applicable.

That the bankruptcy court is not vested with the judicial power of the United States pursuant to Art. III of the Constitution neither dilutes nor makes less applicable the above reasoning. The power granted in section 1481 is the "judicial power of a bankruptcy court," *see* 28 U.S.C. § 151(c), as amended not that of a district or other Art. III court. This judicial power is an incident, a "concomitant" of jurisdiction.[10] H.Rep. at 498. Of the court's jurisdiction and powers, Judiciary Chairman Rodino stated:

> [b]roader than that . . . exercised by the district courts sitting in bankruptcy and by referees in bankruptcy [under the Bankruptcy Act of 1898] . . . .
>
> In addition, the new bankruptcy court would be given all powers, judicial in nature . . . .[11]

No wonder debtor-applicant's counsel was moved to say, "[w]e viewed the matter of appointing a special master as . . . easily within the Court's power and authority." M. H. Trans. at 37.

**10.** Quibbling over the institutional, as contrasted with Constitutional, properties of the court's jurisdiction could easily devolve, under a new guise, into the frequent, "time consuming, and expensive litigation" which the architects of the Code identified as "the most serious objection to the division of jurisdiction." Report of the Commission on the Bankruptcy Laws of the United States, Part I at 90 (1973), reprinted in Collier at 1–20. The proposition that the powers of the court must be or are enumerated in the Code is simply contrary to the approach taken therein.

> In *Young v. Higbee Co.*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945), the Supreme Court indicated that bankruptcy courts, as courts of equity, "exercise all equitable powers unless prohibited by the Bankruptcy Act." *Id.* at 214, 65 S.Ct. at 599. Can it be seriously argued that the court's powers under the new Code are less?

**11.** Letter of Chairman Rodino, reprinted in H.Rep. at 63, referring to H.R. 31, 94th Cong., 1st Sess. (1975). However, the court's jurisdiction, as conferred by H.R. 8200, 95th Cong., 1st Sess. (July 11, 1977), "is at least as broad, but for the power of contempt, as the court contemplated by H.R. 31." 1 Collier on Bankruptcy ¶ 2.01[1][c] at 2–25 (15th ed. 1980) [hereinafter "Collier"].

The precise question here presented was passed upon in *Nephi Irrigation Co. v. Jenkins*, 8 Utah 369, 31 P. 986 (1893), by the Chief Justice of the Supreme Court of Utah, when that court was a territorial court established by Congress pursuant to its plenary powers as contained in Art. IV, sec. 3, cl. 2. *American Insurance Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828). Similarly, the bankruptcy court is established by Congress pursuant to its authority, Art. I, sec. 8, cl. 4 of the Constitution, "to establish uniform Laws on the subject of bankruptcies throughout the United States." *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 594, 69 S.Ct. 1173, 1179, 93 L.Ed. 1556 (1949). According to *Jenkins*, the powers of the court were statutorily expressed as follows:

> [T]he supreme court and the district courts, respectively, of every territory, shall possess chancery, as well as common-law jurisdiction.

31 P. at 987. Interestingly, the federal district and circuit courts had extended to the territories prior to the territories being given systems of their own. R. Pound, *Organization of Courts*, 107–08 (1940). In any event, the language cited above would appear to have the same meaning as the relevant portions of section 1481 of Title 28, United States Code. The lower court, unable to determine certain factual issues without the aid of a master, decided not to make the appointment absent agreement of the parties.

The *Jenkins* court held that, *sua sponte*, the court was duty bound to call a master to determine the facts. Speaking in the institutional sense, the Court equated power with jurisdiction and concluded that the power of a court in equity to appoint a master is well settled. Of course, such "inherent power . . . is the same whether the court sits in equity or at law." *Peterson, supra*, at 314, 40 S.Ct. at 547.

Thus, it is not the constitutional basis of congressional action which governs, but rather, the nature of judicial institutions which antedated the Constitution itself. *Peterson, supra*, holds that:

> [C]ourts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties. . . . *From the commencement of our government*, it has been exercised by the Federal courts, when sitting in equity, by appointing either with or without the consent of the parties, special masters.

*Id.* at 312–13, 40 S.Ct. at 547 (emphasis added). The Supreme Court goes on to cite, as further authority for the above proposition, *Kimberly v. Arms*, 129 U.S. 512, 9 S.Ct. 355, 32 L.Ed. 764 (1889), a case which originated in the Northern District of Ohio. As previously stated, *Peterson* holds the same power to exist on the law side, citing *Heckers v. Fowler*, 69 U.S. (2 Wall.) 123, 17 L.Ed. 759 (1865). By citing *Kimberly* and *Heckers*, the Court reinforces its outright statement that consent of the parties is irrelevant to the appointive power itself.[12]

Assuming that consent is not a distinguishing factor, we learn from *Heckers, supra*, that the "[p]ractice of referring pending actions under a rule of court . . . was well known at common law." *Id.* at 131. Another authority indicates that the "power is as old as [the] Court itself." 30A C.J.S. *Equity* § 522, at 564 n.23 (1965) citing *In re Caruba*, 51 A.2d 446, 139 N.J.Eq. 404, *aff'd* 55 A.2d 289, 140 N.J.Eq. 563, *pet. denied*, 61 A.2d 290, 142 N.J.Eq. 358, *cert. denied*, 335 U.S. 846, 69 S.Ct. 69, 93 L.Ed. 396 (1948).[13]

---

**12.** Parenthetically, the consent may have an impact upon the weight to be afforded the master's finding. *Kimberly, supra*, at 524, 9 S.Ct. at 359.

**13.** In *Caruba*, the Court stated:

The power of the Chancellor to make references to masters is as old as the Court itself [citation omitted], and the power to make references to his Vice Chancellors who are but "Headmasters," is of like antiquity. Although the appointment of Vice Chancellors by the Chancellor in N.J. is authorized by statute, so far as the *power of appointment* is concerned, the statute was but declaratory of

In defining our institutions, we seek guidance from the past, both recent and distant. This is what was done, when the constitutionality of another "legislative" court was attacked in *American Insurance Co. v. 356 Bales of Cotton, supra,* where Chief Justice Marshall was quick to point out:

> A case in admiralty does not, in fact arise under the Constitution or laws of the United States. These cases are as old as navigation itself; and the law, admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise.

26 U.S. (1 Pet.) 511, 545–46, 7 L.Ed. 542 (1828). Along the same lines, only this time in connection with the nature of the "justicable," Justice Frankfurter ruled that we should concern ourselves with "what was generally speaking, the business of the Colonial courts and the courts of Westminster when the Constitution was framed." *Joint Anti-Facist Refugee Committee v. McGrath,* 341 U.S. 123, 150, 71 S.Ct. 624, 637, 95 L.Ed. 817 (1951).

Having established the unbroken tradition in all courts at law and equity, we hold the power to appoint a special master to be well within the jurisdiction and attendant powers of a bankruptcy court.

## DENIAL OF MOTION

A showing of likelihood of success on the merits of the appeal must be made if a stay pending appeal is to be granted. Moreover, harm to the parties and the public must be considered. *In re Sung Hi Lim,* 7 B.R. 319 (D. Hawaii 1980).

As indicated, a delay in the conversion of products liability claims to dollars runs counter to an early proposal, acceptance and distribution under a plan of reorganization. Such delay likewise adversely affects the products liability claimants in pursuit of White, co-defendants and insurance proceeds. Appellant has failed to show, with any degree of certainty, that harm of any kind will be sustained by appellant absent a stay, let alone irreparable harm. The public interest, though difficult to measure in a

case impacting primarily on private rights, is generally served by moving forward.

Most important, however, is the absence of a showing that appellant is likely to prevail on the merits of its appeal.

Accordingly, the motion for stay pending appeal is denied.

So ordered.

---

a power which has resided in the Chancellor almost time out of mind.

139 N.J.Eq. at 416, 51 A.2d at 454–55. (emphasis in original).