**In re WHITE FARM EQUIPMENT COMPANY, Debtor.**

Misc. No. 83–82.

United States District Court, N.D. Ohio, E.D.

March 16, 1984.

Robin Phelan, Robert D. Albergotti, Haynes & Boone, Dallas, Tex., for White Farm Equipment Co.

R. Curtiss Mabbitt, Grand Rapids, Mich., Sam A. Zingale, Cleveland, Ohio, Lancaster Smith, Jr., Dallas, Tex., Richard J. Tonkin, Van de Verr, Gargia, Tonkin, Kerr & Heaphy, P.C., Detroit, Mich., Dennis M. O'Dea, Chicago, Ill., Michael O'Shea, John J. Grech & Assoc., Sterling Hts., Mich., Melvin R. Schwartz, Southfield, Mich., J. Frank Kinsel, Waco, Tex., L. Roland Roegge, Grand Rapids, Mich., T.L. Majoros, Cicinelli, Mossner, Majoros & Alexander, P.C., Saginaw, Mich., Sherwin A. Winniford, Waco, Tex., Glendon B. Adams, Sugarland, Tex., Jon F. Schmoll, Spangler, Jennings, Spangle & Dougherty, Merrillville, Ind., Paul F. Anderson, Houston, Tex., John Cronquist, Cleveland, Ohio, Graham Heikes, Jardin, Logan & O'Brien, St. Paul, Minn., Ralph F. Mitchell, Cincinnati, Ohio, R. Burke McLemore, Thomas. & Thomas, Harrisburg, Pa., Andrew Briscoe, Rosenberg, Tex., Tommy Allison, Longview, Tex., Mitchell R. Spector, Minneapolis, Minn., Joseph F. Hutchinson, Jr., Akron, Ohio, G. Thomas Miller, Harrisburg, Pa., Michael L. Johnson, Sacramento, Cal., Carlyle H. Chapman, Jr., Dallas, Tex., J.W. Cragg, Minneapolis, Minn., Ardell W. Skow, Doar, Drill & Skow, Baldwin, Wis., Tom Brenner, Goldberg, Evans & Katzman, Harrisburg, Pa., William A. Wilson, Weintraub, Genshlea, Hardy, Erich & Brown, Sacramento, Cal., John C. Dupee, Goshen, N.Y., Michael M. Platzman, Middletown, N.Y., Mel J. Garofalo, Hedrick, Feerick, Eatman, Gardner & Kincheloe, Charlotte, N.C., Ronald Dilthey, Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, Raleigh, N.C., William B. Stapleton, Georgetown, Ohio, Tom Finarelli, Philadelphia, Pa., George Rich, Magavern, Magavern, Lowe, Beilewech, Dopkins & Fadale, Buffalo, N.Y., Keith Sjodin, Waconia, Minn., Morris R. Blane, Berger & Kirschenbaum, Cleveland, Ohio, David Faulkner, Cincinnati, Ohio, Lee Hagen, West Fargo, N.D., James T. Hofelich, Cleveland, Ohio, Arnold Katz, Lester, Schwab, Katz & Dwye, New York City, Martin Rosenblum, Middletown, N.Y., Carlton J. Hunke, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N.D., Robert M. Osburn, Dallas, Tex., Saul I. Ruman, Hammond, Ind., G. Christopher Meyer, Cleveland, Ohio, for claimants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Pursuant to General Order 61(c)(2) of the Northern District of Ohio (effective December 25, 1982)[1], this Court, on April 1, 1983, withdrew the reference to the bankruptcy judge of that portion of the White Farm bankruptcy reorganization dealing with the disposition of the product liability cases and vacated the appointment of the Special Master.

Parties affected by the order were directed to submit briefs and appear for a hearing on June 29, 1983 on the issue of how best to proceed with disposition of the White Farm product liability claims still pending. After consideration of the proposals and the facts in those cases where

---

1. In *White Motor Corporation v. Citibank, N.A.,* 704 F.2d 254 (6th Cir.1983), the Sixth Circuit held that the interim rule governing bankruptcy procedure adopted under General Order 61 was constitutional.

individual parties had submitted briefs, this Court concludes that the reference should be remanded to the Bankruptcy Court for purposes of estimating, determining, and allowing the product liability claims still pending in accordance with § 502 of the Bankruptcy Code.

## FACTS

White Farm Equipment Corporation ("White Farm") is one of several White Motor Corporation ("White Motor") affiliates which were swept under the protective wing of the Bankruptcy Court on September 4, 1980 when White Motor filed for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, 2685 (1978), 11 U.S.C. § 1101 *et seq.* At the time, a number of product liability suits arising from accidents involving White-manufactured farm implements were pending against White Farm in various state and federal courts. All were stayed by operation of the "automatic stay" provision of 11 U.S.C. § 362(a).[2]

After filing for reorganization, White Farm operated its business as a debtor-in-possession. It ceased to be a wholly owned subsidiary of White Motor on December 19, 1980 when it was sold to White Farm USA, Inc., a subsidiary of TIC Investment Corporation ("TIC"). White Farm's bankruptcy reorganization proceeded separately from White Motor's reorganization after the sale.

A special master was appointed by the Bankruptcy Court on April 11, 1981. On June 30, 1981, White Farm filed its Plan of Reorganization and on August 20, 1981 filed its First Amended Plan of Reorganization (the "Plan"). That same date, the Bankruptcy Court approved for circulation White Farm's Consolidated Disclosure Statement and Summary Disclosure Statement ("Disclosure Statement") regarding the Plan. The Plan and Disclosure Statement were distributed to interested parties along with ballots for accepting or rejecting the Plan. Included in the Disclosure Statement was White Farm's Application for Disposition of Product Liability Claims ("Product Liability Program" or "Program"). Parties were advised that October 19, 1981 would be the last date for filing objections to confirmation of the Plan and that hearings on the Plan would take place October 28–29, 1981. The Bankruptcy Court entered an order confirming the Plan ("Confirmation") on October 30, 1981.[3] The Confirmation was not appealed.[4]

On May 3, 1982, the Bankruptcy Court conducted a hearing on the Product Liability Program which had already been incorporated into White Farm's confirmed Plan. The Program provided that the Bankruptcy Court would, under § 502 of the Code, determine and allow the product liability claims for which proofs of claim had been filed. White Farm planned to settle as many claims as possible by agreement of the parties; those claims which could not be settled would be referred to the Special Master. The Disposition Program provided in part:

2. 11 U.S.C. § 362(a) gives the debtor a breathing spell from its creditors by prohibiting the initiation or prosecution of any action against a debtor involving a claim which arose prior to the filing of the bankruptcy petition. The stay applied not only to suits pending against White Farm on September 4, 1980, but also to subsequently filed suits arising from occurrences prior to September 4, 1980. All are described as "prepetition" claims.

3. Claims against White Farm were divided into nine different classes; the product liability claims were assigned to Class Eight—"All other nonpriority unsecured claims against WFE [White Farm Equipment]." Disclosure State-

ment, p. 24. As of July 31, 1981, the claims in Class Eight were estimated to total $96,530,000 and include approximately $76,000,000 of disputed product liability, warranty, and other litigated claims. *Id.* at 36. All prepetition product liability claims would, under the Plan, be treated as general unsecured debts, and were to be paid, in cash, 65% of the allowed amount of each claim. *Id.* at 34 and 25.

4. White Motor Corporation filed a Notice of Appeal on August 16, 1982 in C82–3123 challenging a portion of the Product Liability Program, but later voluntarily dismissed the appeal through a joint stipulation with White Farm entered February 28, 1983.

(b) WFE should evaluate each claim filed by the holder of a Product Liability Claim and offer a fair and reasonable cash settlement to all or substantially all of such claimants in full and complete satisfaction of all liabilities of WFE and its insurance carrier to such claimant. All settlements of Product Liability Claims for cash payments should be approved by this Court as a compromise of controversy in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

(c) All Product Liability Claims not compromised through cash settlement should, alternatively, be compromised by allowing each Product Liability Claim in an amount to be agreed between the holder of such claim and WFE. Such compromises with respect to the amount of the allowed claim in this Chapter 11 reorganization case should be approved by this Court as a compromise of controversy in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

Parts 7(d) and (e) of the Product Liability Program provided that the Special Master would estimate the value of the product liability claims without benefit of a jury trial; he would, however, apply the applicable law of the state in which the action arose.

(d) All Product Liability Claims which cannot be compromised shall be determined by this Court and the Special Master appointed by this Court on May 11, 1981 to liquidate Product Liability Claims in connection with this Chapter 11 reorganization case. The amount of each Product Liability Claim so determined shall be allowed as a claim in this Chapter 11 reorganization case, in accordance with the provisions of Section 502(c) of the Bankruptcy Code.

(e) Proceedings before the Special Master to estimate the value of Product Liability Claims pursuant to section 502(c) of the Bankruptcy Code shall proceed without a jury: the Bankruptcy Rules and Interim Bankruptcy Rules shall apply to and proceedings shall be conducted in accordance with Bankruptcy Rules 914 and 917; the substantive law of the jurisdiction wherein the cause of action arose shall apply to said proceedings to the extent such law would apply absent the Chapter 11 reorganization case.

Liabilities of White Farm's insurance carriers in connection with product liability claims were also to be determined under the Disposition Program.

A number of the product liability claimants objected to the Disposition Program. On July 26, 1982, the Bankruptcy Court entered an order approving White Farm's Application for Disposition of Product Liability Claims. None of the product liability claimants appealed the Bankruptcy Court's July 26, 1982 order, even though only a month before, the Supreme Court, in *Northern Pipeline Company v. Marathon Pipe Line*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), had held that the jurisdiction granted to bankruptcy judges by the Bankruptcy Reform Act of 1978 violated Article III of the Constitution. Notwithstanding *Northern Pipeline*, not one of the product liability claimants questioned the Bankruptcy Court's authority to exercise jurisdiction over the disposition of their claims.

In the meantime, product liability claimants and creditors in the White Motor bankruptcy reorganization were challenging the Bankruptcy Court's jurisdiction to appoint a Special Master and to approve a product liability disposition program for him to administer. After this Court vacated the appointment of the Special Master in White Motor's reorganization,[5] the Sixth Circuit Court of Appeals affirmed that portion of the decision stating:

... As a matter of good bankruptcy administration, we believe that the cases

---

**5.** *Citibank, N.A. v. White Motor Corp.*, 23 B.R. 276 (D.C.N.D.Ohio 1982), *rev'g* 11 B.R. 294 (Bkrtcy.N.D.Ohio 1981), *rev'd in part and re-* manded (for reconsideration in light of interim rule), 704 F.2d 254 (6th Cir.1983).

involving difficult legal and factual issues should, if practicable, be heard by a judicial officer, the District Court, the Bankruptcy Court or a U.S. Magistrate appointed as a special master.

*White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254, 265 (6th Cir.1983). The Sixth Circuit also considered the constitutionality of an Emergency Rule for Bankruptcy Procedure, "Interim Rule" proposed by the Judicial Conference of the United States and adopted by the Northern District of Ohio, as General Order 61, which provides for the continued operation of the Bankruptcy Courts during the jurisdictional lapse created by *Northern Pipeline*. The Sixth Circuit affirmed the validity of the Interim Rule and held that:

> The district court has the power under the interim rule to withdraw the referral of a bankruptcy matter at any time and may vacate or modify orders of the bankruptcy court.

*Id.* at 265.

■ The power to withdraw the reference is specifically granted in Section (c)(2) and may be exercised by the district court on its own motion.[6] Heeding the Sixth Circuit's holding with respect to the appropriate judicial officer to hear product liability cases in bankruptcy, and invoking the power in Section (c)(2) of the Interim Rule, this Court, on April 22, 1983, withdrew the reference from the Bankruptcy Court of that portion of the White Farm bankruptcy reorganization dealing with the disposition of product liability cases and vacated the appointment of the Special Master. 29 B.R. 795. A hearing was set for June 29, 1982 to consider which of the four alternatives[7] propounded by the Sixth Circuit should be utilized to dispose of still unresolved product liability cases. White Farm gave forty-seven claimants notice of the

hearing; less than half appeared or briefed the issue; all representatives of the claimants and White Farm were allowed to fully and comprehensively argue their respective positions at the lengthy hearing. Nearly all the claimants asked to be returned to the court where their claims were originally filed; White Farm and White Farm's Creditors Committee urged resolution of the claims in the Bankruptcy Court.

## CONCLUSIONS OF LAW

### I. *Collateral Attacks are Disfavored*

■ Critical to this Court's decision to remand the cases to the Bankruptcy Court are long-established principles prohibiting the use of collateral attacks to challenge unfavorable decisions. A party who has bypassed a chance to challenge a court's subject matter jurisdiction may not reopen the issue in a collateral attack. *Insurance Corporation of Ireland, Ltd., v. Compagnie des Bauxites*, 456 U.S. 694, n. 9, 102 S.Ct. 2099, n. 9, 72 L.Ed.2d 492 (1982) (citing *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940)).

■ The product liability claimants had two opportunities to appeal, yet they did not avail themselves of their right to appeal either the October 30, 1981 Confirmation order or the July 26, 1982 order approving the Product Liability Program. The details of the Program were revealed prior to Confirmation, hence its validity could have been the subject of an appeal from the Confirmation. Parties who did not object to the Bankruptcy Court's jurisdiction to estimate their claims pursuant to § 502 of the Code by appealing from its July 26, 1982 order are precluded from now collaterally attacking his power to hear

---

**6.** (c) Reference to Bankruptcy Judges

(2) The reference to a bankruptcy judge may be withdrawn by the district court at any time on its own motion or on timely motion by a party.... If a reference is withdrawn, the district court may retain the entire matter, may refer part of the matter back to the bankruptcy judge, or may refer the entire matter back to the bankruptcy judge with instructions specifying

the powers and functions that the bankruptcy judge may exercise....

**7.** The four suggested alternatives are resolution by: 1) the District Court, 2) the Bankruptcy Court, 3) a U.S. Magistrate appointed as a special master, or 4) the state or federal court in which the suits were originally filed.

their cases. Likewise, parties who did not challenge the constitutionality of section 7(e) of the Disposition Program (Disclosure Statement at 44) on appeal from either order may not now raise the issue of a right to a jury trial. Their failure to appeal constitutes a waiver of the issue and a bar to a collateral attack in the context of this Court's withdrawal of reference.

## II. *Effect of Confirmation of White Farm's Plan*

Also of significance to this Court's decision is White Farm's confirmed Plan and the role the debtor's creditors played in the Confirmation. When this Court withdrew the reference and vacated the Special Master's appointment, White Farm's Plan had already been confirmed. Confirmation had been accomplished, in accordance with the Code, through the use of a disclosure statement followed by creditor voting.

The disclosure statement in a Chapter 11 proceeding is designed to provide the creditors with information which will permit them to make an informed judgment and assist them in prudently deciding whether acceptance of the plan is consistent with their particular interests.[8] It is not unusual, at this stage of the proceedings, for

the creditor's committee and the debtor-in-possession to negotiate together to formulate a plan that will satisfy the parties in interest, thus facilitating confirmation.[9] White Farm's creditors' committee did, indeed, negotiate the Product Liability Program which was ultimately incorporated into the confirmed Plan. The committee advocated a product liability program as a means to effectively and fairly liquidate the product liability claims in accordance with § 502(c) of the Code [10] and to allow claimants to receive payments from White Farm without burdensome delay. *See,* Official Creditors' Committee Brief Regarding Objections to the Product Liability Claims Program at 2. Urging this Court not to disturb the Program, the creditors' committee points to the Program's record of resolving all but eighteen of the forty-five original claims as evidence of its acceptability to the claimants.

The Program's apparent success rate is not the only indicia of its acceptability. Creditors also express their approval or disapproval of a proposed plan through the ballots circulated with the Plan and Summary Disclosure Statement pursuant to § 1126.[11] Under the Code, a class of

---

**8.** Title 11 U.S.C. § 1125 requires disclosure before solicitation of acceptance of a plan of reorganization. Section 1125(a) defines the disclosure statement and the "adequate information" standard which must be satisfied. The section provides:

§ 1125 **Postpetition disclosure and solicitation**

(a) In this section—

(1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan; and

(2) "investor typical of holders of claims or interests of the relevant class" means investor having—

(A) a claim or interest of the relevant class;

(B) such a relationship with debtor as the holders of other claims or interests of such class generally have; and

(C) such ability to obtain such information from sources other the disclosure required by

this section as holders of claims or interests in such class generally have.

**9.** *See,* Hopper, *Confirmation of a Plan Under Chapter 11 of the Bankruptcy Code and the Effect of Confirmation on Creditor's Rights,* 15 Ind.L.Rev. 501, 505 (1982).

**10.** Title 11 U.S.C. § 502(c) provides:

(c) There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay the closing of the case; or

(2) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment.

**11.** Subsection (a) of § 1126 permits the holder of a claim or interest allowed under § 502 to accept or reject a proposed plan of reorganization. The section provides:

§ 1126 Acceptance of plan.

(a) The holder of a claim or interest allowed under section 502 of this title may

claims, as classified in the proposed reorganization plan, will be deemed to have accepted the plan if the class members accede to it by at least two-thirds in dollar amount, and more than one-half in number, of the allowed claims in the class. § 1126(c). In tallying the votes, claims of creditors who neither accept nor reject the proposed reorganization plan are not considered.

■ The creditors' votes in White Farm indicate that the Plan was accepted under both the two-thirds and the one-half requirements. A total of 1836 creditors responded; 1556 accepted the plan, only 46 rejected it. The remaining 224 respondents returned their ballots without voting.[12] Of the total number of creditors, 1459 fell under Class 8, the class to which the product liability claimants were assigned. Hence, the product liability claimants were bound by their fellow Class 8 members' acceptance. Upon Confirmation, the debtor and all creditors are bound by the Plan, whether or not the individual creditors have accepted the plan or have claims which are impaired. § 1141.[13] Parties who are unhappy with disposition of their objections to the Plan may appeal the Bankruptcy Court's action and pursue their objections on appeal.[14] As stated earlier, none of the claimants availed themselves of their right to appeal.

■ The fact that White Farm's Plan had already been accepted by its creditors

and confirmed by the Bankruptcy Court prior to the Sixth Circuit's decision in *White Motor v. Citibank, N.A., supra,* thereby creating a contractual relationship between White Farm and its creditors which delineated their respective rights and duties, persuades this Court to uphold the validity of the Product Liability Program insofar as it does not conflict with the Sixth Circuit's holding that product liability claims must be resolved by a judicial officer. In addition, the product liability claimants' failure to challenge the validity of the Program, and in some cases their willing consent to its jurisdictional provisions,[15] precludes them from collaterally attacking it now.

All product liability cases previously withdrawn are referred back to the Bankruptcy Court for determination and allowance pursuant to § 502 of the Code.

IT IS SO ORDERED.

---

accept or reject a plan. If the United States is a creditor or equity security holder, the Secretary of the Treasury may accept or reject the plan on behalf of the United States.

**12.** The provisions of § 1126(c) indicate that creditors are ill-advised to ignore the balloting because if objections to the disclosure statement or proposed plan are not advanced by an individual class member, a non-voting class member will be bound by the class vote. *See,* Hopper, *Confirmation of a Plan Under Chapter 11, supra* at 507.

**13.** The legislative history to § 1141 states:
Subsection (a) of this section makes the provision of a confirmed plan binding on the debtor, an entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or

not the claim or interest of the creditor, equity security holder, or partner is impaired under the plan and whether or not he has accepted the plan. There are two exceptions, enumerated in paragraph (2) and (3) of subsection (d).
H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 418 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 129 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5915.

**14.** *E.g.,* in *White Motor v. White Farm,* C82–3143, White Motor filed a Notice of Appeal from the Bankruptcy Court's order concerning White Motor's objection to White Farm's Program for Disposition of Product Liability Claims.

**15.** *See, e.g.,* compliance with special master's Pretrial Summary Order in *James Shackelford v. Vermeer Manufacturing Co. (In Re White Farm Equipment Company).*