In re The WHITE MOTOR CREDIT CORPORATION, White Motor Corporation, Gemini Manufacturing Company, White Motor Corporation of Canada Limited, The White Motor Credit Corporation of Canada Limited, Debtors,

CITIBANK, N.A. and the other bank creditors listed on Exhibit I, Appellants,

v.

The WHITE MOTOR CORPORATION, Debtor and Debtor in Possession, Appellee.

In re WHITE MOTOR CORPORATION, Gemini Manufacturing Co., White Motor Corporation of Canada Limited, The White Motor Credit Corporation of Canada Limited, Debtors,

ROCKWELL INTERNATIONAL CORPORATION, et al., Appellants,

v.

WHITE MOTOR CORPORATION, Appellee.

The TIMKEN COMPANY, Appellant,

v.

WHITE MOTOR CORPORATION, Appellee.

SKF INDUSTRIES, INC., Appellant,

v.

WHITE MOTOR CORPORATION, Appellee.

Robert L. DEATON, Garelick Farms, Inc. and Hanover Insurance Company, Appellants,

v.

WHITE MOTOR CORPORATION, Appellee.

Larry MOORE and Brenda Moore, Appellants,

v.

WHITE MOTOR CORPORATION, Appellee.

Civ. A. Nos. C81–1088, C82–2898, C82–2887, C82–2888, C82–2834, C82–2426 and C83–1151.

United States District Court, N.D. Ohio, E.D.

Feb. 17, 1984.

Joseph Patchan, Cleveland, Ohio, for appellants.

John C. Parks, Cleveland, Ohio, for appellee.

MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This Memorandum and Order sets forth this Court's determination of the proper forums for resolving products liability claims that are pending against White Motor Corporation ("White").

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 1471(a) and (b); rule (c)(2) of the interim rule governing the Bankruptcy Court adopted by the United States District Court for the Northern District of Ohio as General Order No. 61 (effective Dec. 25, 1982); and the mandate of the Sixth Circuit Court of Appeals in *White Motor Corporation v. Citibank, N.A.,* 704 F.2d 254, 265 (6th Cir.1983).

I

A.

White and its affiliates filed for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978 ("Code"), 11 U.S.C. § 1101 *et seq.,* on September 4, 1980. The relevant facts are not in dispute and are set forth in detail in earlier opinions by this Court.[1] When White sought the protection of the Bankruptcy Court, about 160 state-law products liability actions, comprising some 500 individual claims, were at various procedural stages in state and federal courts throughout the country ("pre-petition" claims). Each suit presents a contingent, unliquidated claim. All have been frozen for three-and-a-half years by the "automatic stay" provision of 11 U.S.C. § 362(a),[2] as have been suits filed after the petition date but involving causes of action that arose before that date. In addition, in some cases White has sought to use the Code to stay suits involving causes of action that arose after September 4, 1980 ("post-petition" claims).[3]

On April 22, 1981, White asked the Bankruptcy Court to appoint a Special Master to adjudicate the products liability claims. The same day, the Bankruptcy Court issued an Order Appointing a Special Master ("Order"). Citibank, N.A. and other bank creditors of White ("bank creditors") filed a Notice of Appeal on May 1, 1981. On May 18, 1981, this Court denied a motion for a stay, after which the Special Master formulated a Products Liability Claims Disposition Program ("Program"). On July 7, 1982, the Bankruptcy Court approved the Program. Appeals of both the Order and Program then came before this Court, which after a hearing on September 13, 1982, stayed the Special Master from implementing his Hearing Memorandum pursuant to the Program until the appeals could be heard.

1. *Citibank, N.A. v. White Motor Corporation (In re White Motor Credit Corporation),* 23 B.R. 276 (N.D. Ohio 1982), *rev'g* 11 B.R. 294 (Bkrtcy.N.D. Ohio 1981), *rev'd in part and remanded,* 704 F.2d 254 (6th Cir.1983) (remanding for reconsideration in light of interim rule); *Rockwell International Corporation v. White Motor Corporation,* 24 B.R. 200 (N.D. Ohio 1982), *vacated and remanded per curiam sub nom. Larry and Brenda Moore v. White Motor Corporation,* 711 F.2d 1057 (6th Cir.1983) (remanding for reconsideration in light of *White Motor Corporation v. Citibank, N.A., supra* ).

2. Title 11 U.S.C. § 362(a) provides:
   Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—
   (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . .

3. White originally sought a determination from the Bankruptcy Court that post-petition claims were stayed by § 362. The court denied that request on April 5, 1983. Recently, White has filed motions for permanent injunctions in the courts where the post-petition claims are proceeding, arguing that such claims are barred by 11 U.S.C. § 1141(d)(1) and § 524(a). White also sought an injunction from this Court to halt a pending state court trial in a post-petition case. The injunction was denied. *White Motor Corporation v. Aron Chambliss, et al. (In Re White Motor Corporation),* No. 84–402 (N.D. Ohio Feb. 10, 1984). White's argument is discussed in Parts I–C and III, *infra.*

## B.

### 1.

In their appeal, the bank creditors contended that the Bankruptcy Court was not an Article III court and therefore lacked authority to appoint a Special Master to adjudicate state law products liability claims. On September 20, 1982, guided by the then-recent decision in *Northern Pipeline Company v. Marathon Pipe Line*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), this Court agreed that the Bankruptcy Court could not constitutionally rule on the claims. It therefore vacated the appointment of the Special Master, on the ground that the Bankruptcy Court could not delegate authority it did not possess. *Citibank, N.A. v. White Motor Corporation (In re White Motor Credit Corporation)*, 23 B.R. 276 (N.D.Ohio 1982).

Three days after that opinion was issued, the Judicial Conference of the United States passed a resolution that led to the drafting of an interim rule. The rule provided for the continued operation of the Bankruptcy Courts after *Northern Pipeline* became effective on December 24, 1982. Pursuant to a directive from the Judicial Council of the Sixth Circuit, the judges of this District adopted the interim rule as General Order No. 61. The interim rule reestablished the Bankruptcy Court as an adjunct of the District Court, permitting its judges to hear cases and issue orders. Under the rule, the Article III courts may withdraw the reference of cases from the Bankruptcy Court and conduct *de novo* review of all decisions made there.

On appeal, the Sixth Circuit affirmed this Court's holding that neither the Bankruptcy Court nor the Special Master could constitutionally hear the products liability cases pursuant to 28 U.S.C. § 1471(c), the jurisdictional provision voided in *Northern Pipeline. White Motor Corporation v. Citibank, N.A., supra,* 704 F.2d at 259. The Court of Appeals then went on to examine the interim rule, which was adopted after this Court had issued its September 20, 1982 opinion.

Finding the rule constitutional, the panel held that

> ... Pursuant to interim rule (d)(1), in the absence of district court action to the contrary, the bankruptcy judge may perform all acts necessary for handling of the White Motor case including adjudication of the products liability cases.

*Id.* at 264. Concluding that the interim rule authorized this Court to withdraw the reference of matters from the Bankruptcy Court, it decided that

> ... The Order vacating the appointment Order shall be treated as a withdrawal by the District Court of that portion of the White Motor reorganization dealing with the disposition of the products liability cases. Under interim rule (c)(2), the District Court may refer back to the Bankruptcy Court any part of the White Motor products liability litigation with instructions specifying the powers and functions that the bankruptcy judge may exercise.

*Id.* at 265.

The Court suggested four possible forums for handling the products liability cases and instructed this Court to hold a hearing and "determine the best method for adjudicating" the cases. *Id.* The four forums suggested were:

(1) this Court;

(2) the Bankruptcy Court;

(3) a United States Magistrate appointed as Special Master pursuant to Fed.R. Civ.P. 53; or

(4) the courts where the cases were initially pending.

Pursuant to this mandate, this Court held a lengthy hearing on June 1, 1983. White gave hundreds of claimants notice of the hearing; dozens of representatives of both White and the claimants appeared and exhaustively briefed and argued the pros and cons of the four options. Representatives of post-petition claimants also appeared at the hearing, concerned that the *Citibank* opinion might be interpreted to give this Court jurisdiction over those claims as well.[4]

---

4. The initial *Citibank* appeal involved only the

Program, which at that time was limited to

White has endorsed this position, both by accepting proofs of claim from post-petition claimants, and by its statements at the hearing.[5]

2.

While the bank creditors had challenged the appointment of the Special Master, six pre-petition products liability claimants filed a separate appeal challenging the validity of the Program he had formulated. The claimants included plaintiffs—persons injured by allegedly defective White products or, in wrongful death actions, their widows and/or surviving children—and White's co-defendants in the product liability cases. Treating its *Citibank* decision as controlling, on October 12, 1982 this Court vacated the Order approving the Program. *Rockwell International Corporation v. White Motor Corporation (In re White Motor Corporation)*, 24 B.R. 200 (N.D.Ohio 1982), *vacated and remanded per curiam sub nom. Larry and Brenda Moore v. White Motor Corporation*, 711 F.2d 1057 (6th Cir. 1983). This Court directed the Bankruptcy Court to exempt the six parties from the Program and to continue the stay of the Hearing Memorandum. However, only those who had filed timely appeals were permitted to challenge the Special Master's rulings; his other decisions disposing of claims under the Program were held *de facto* valid and *res judicata* in collateral actions.

White appealed. After the Sixth Circuit issued its *Citibank* opinion, the claimant-appellees moved to remand the case to this Court. White concurred, and a separate panel of the Court of Appeals remanded the case to this Court for reconsideration in light of *Citibank.*

3.

Two of the appellants in *Rockwell,* Larry and Brenda Moore, initiated a separate appeal from the Bankruptcy Court's refusal to grant their petition for relief from the § 362(a) automatic stay.

The Moores had commenced a products liability action in 1979 in the Circuit Court of St. Louis, Missouri against White and several other defendants. They sought damages for a 1976 accident involving a White vehicle which left Larry Moore with third-degree burns over ninety percent of his body. The case was stayed on September 4, 1980, when White filed for reorganization.

After the Bankruptcy Court appointed the Special Master, the Moores filed a timely objection to the Program, asking that the stay be lifted and that they be permitted to conduct discovery of White's liability insurance policies. Upon the Bankruptcy Court's denial of their motions, the Moores filed an appeal which was heard by this Court during the *Rockwell* proceedings. On October 21, 1982, after this Court issued its Order in that case, the Moores filed a complaint for relief from the stay with the Bankruptcy Court. At a hearing held on January 21 and 22, 1983, the Moores contended that because White retains more than $2 million in insurance coverage for 1976 (the year

---

pre-petition claims. However, the Sixth Circuit's language remanding to this Court "that portion of the White Motor reorganization dealing with the products liability cases" appeared to broaden the scope of the appeal to include post-petition as well as pre-petition claims. Accordingly, in an appropriate abundance of caution, counsel for many post-petition claimants appeared at the hearing to seek direction from this Court.

**5.** At the hearing White's counsel stated:
MR. PARKS: Post-petition claims are being handled in the ordinary course of business. An automatic stay of 362(a) would not apply, or one could argue it does not apply to claims which occurred or occurrences which

took place after September 4, 1980, in the case of White Motor, that is, post-petition occurrences.

The product liability claims disposition program as originally conceived and originally developed by the debtor did not include claims based upon post-petition occurrences.

\* \* \* \* \* \*

Through a process of elimination, we take the view they are claims. If they are going to get paid, *they are going to be paid by part of the reorganization plan . . .*

*Citibank, N.A. v. White Motor Corporation, supra* (transcript of June 1, 1983, at 17–18) (emphasis added).

Larry Moore was injured) and at least $45 million in reinsurance, it would suffer a maximum loss of $50,000 in the event the Moores won a judgment. They termed this an insufficient basis for continuing the § 362(a) stay, arguing that the stay was operating to protect not White but the insurance companies. White responded by contending that an adverse judgment would bring it higher insurance premiums, a "loss" to the debtor-in-possession that is impermissible under Chapter 11. The Bankruptcy Court agreed with White and on February 2, 1983 denied their petition for relief.

The Moore's appeal is before the Court for *de novo* review pursuant to interim rule (e)(2)(B).

### C.

This Court's efforts to formulate an appropriate plan permitting the now-desperate claimants to proceed with their products liability cases in some forum have been further complicated by the progress of White's Second Modified Plan of Reorganization, as Amended ("Plan") through the Bankruptcy Court and this Court.

Early in this litigation, White indicated that the products liability suits presented contingent and unliquidated claims which had to be fixed or liquidated in order for White to complete its reorganization. *See Citibank, N.A. v. White Motor Corporation, supra,* 23 B.R. at 277. After the Bankruptcy Court's orders appointing the Special

Master and approving his Program were vacated, however, White changed its strategy. Rather than await disposition of the products liability claims, White created a Reserve Fund from which successful claimants will be paid, and proceeded with the reorganization. On November 18, 1983, the Bankruptcy Court issued an order confirming White's Plan. Article X of the Plan provides for the Reserve Fund described above.[6] With one amendment not related to the products liability claims, this Court affirmed the Confirmation Order.[7]

In a supplemental brief filed on December 19, 1983, White suggested for the first time that the Confirmation Order, in discharging all *debts* that arose prior to the confirmation date, also discharged both the pre-petition and post-petition products liability claims and prevented claimants from pursuing actions against White in any forum except the court handling the Chapter 11 proceedings. White's contention—discussed in greater detail in Part III, *infra* —is that after confirmation the discharge provision, 11 U.S.C. § 1141(d)(1), transformed the § 362(a) automatic stay into a § 524 permanent injunction. Under § 524, White argues, only products liability claimants who have submitted proofs of claim to the Bankruptcy Court pursuant to 11 U.S.C. § 501 may proceed against the reorganized entity, and they may only proceed before

---

6. Article X of the Plan, as amended, provides in pertinent part:

> 10.1. ... [T]he Disposition Assets Trustee shall retain such number of shares of common stock and preferred stock of the Debtor and shall retain and set aside in a reserve fund an amount in cash such that the aggregate number of such retained shares and the aggregate balance of such fund (exclusive of any interest earned thereon) shall be sufficient to make all payments and distributions which may be subsequently required by Section 10.2 below, or such lesser number and amount as may be approved by the Bankruptcy Court from time to time. ...
> 10.2. Subsequent to the Consummation Date when a Claim shall become an Allowed Claim ...:
> (a) ... [T]he Disposition Assets Trustee shall as soon as practicable pay to the holder of such Allowed Claim in cash, without inter-

est, from the Reserve Fund an amount equal to the aggregate of the cash distributions which would have been previously distributed to such holder by the Disposition Assets Trustee, as if such Allowed Claim had been an Allowed Claim eligible for distribution on the Consummation Date.

7. *United States of America v. White Motor Corporation (In Re White Motor Corporation),* No. 83-5082 (N.D. Ohio Jan. 13, 1984). The United States appealed from the Confirmation Order, contending that the Plan lacked adequate guarantees that the government would obtain sufficient funds if it prevailed in a corporate tax dispute. After a hearing on January 12, 1984, attorneys for White and the Department of Justice entered into a stipulation which, *inter alia,* amended the Plan to designate a specific portion of the Reserve Fund for claims filed by the Internal Revenue Service.

this Court, the Bankruptcy Court, or a Magistrate acting as Special Master—not before the state or federal courts where they were filed, or would have been filed but for § 362(a). If White is correct, confirmation of the Plan reduced the four options suggested to this Court by the Sixth Circuit to three.

## II.

### A.

When litigants in dozens of forums scattered around the nation seek to press suits against a reorganizing corporation, a host of competing, complementary, and sometimes confusing equities come into play. At hearings and through pleadings, the parties have been most energetic and diligent in bringing these equities to the attention of this Court.

For more than three years, White reorganized under the protection of the Bankruptcy Court. Chapter 11 of the Code states a Congressional policy that the debtor, its creditors and employees, and the public at large all benefit when the debtor is given opportunities to reduce or extend debts so that it can return to financial viability.

The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap. Often, the return on assets that a business can produce is inadequate to compensate those who have invested in the business. Cash flow problems may develop, and require creditors of the business, both trade creditors and long-term lenders, to wait for payment of their claims. If the business can extend or reduce its debts, it often can be returned to a viable state. It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 220 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6179 ["House Report"].

■ Numerous statutory provisions effectuate the policies behind Chapter 11. The automatic stay of § 362 is among the most important of those provisions. As the Sixth Circuit Court of Appeals has written:

> The legislative history of § 362 discloses a congressional intent to stay proceedings against the debtor, and no other, to preserve the status quo of the estate in an effort to ultimately effect and implement, to the extent possible, a successful and equitable reorganization or liquidation. The Notes of the Committee on the Judiciary identify the debtor as the intended primary congressional beneficiary of the stay . . .
>
> . . . The stay of proceedings was intended to promote an orderly reorganization or liquidation of the debtor's estate thereby benefiting, secondarily, creditors of the estate . . .

*Lynch v. Johns-Manville Sales Corp.,* 710 F.2d 1194, 1197 (6th Cir.1983), citing House Report, *supra,* and S.Rep. No. 95–989, 95th Cong., 2d Sess. 54–55 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840–41 ["Senate Report"].

The § 362 stay freed White from the obligation to defend pre-petition products liability suits across the nation, enabling the corporation to concentrate on its reorganization plan. The stay also, for a time, effectively freed White's co-defendants and insurers from having to go to trial and compensate prevailing plaintiffs or co-defendants entitled to indemnification or contribution. With White's reorganization now complete, that and a number of other equities counsel against any further suspension of these cases.

### B.

**1.**

■ The preeminent equity in these cases at this point is swift adjudication. The acts giving rise to these suits took place as long ago as the mid-1970s. Tort victims, their

widows, and their children in the pre-petition cases have been prevented from pursuing their cases since 1980, as their claims have been bounced from the Bankruptcy Court to the District Court to the Court of Appeals and back again. They have ample reason to liken themselves to Dickens characters, as the victims of a modern-day *Jarndyce v. Jarndyce*.[8]

This Court, then, must give considerable deference to whichever forum can most knowledgeably and swiftly bring these cases to conclusion. While judicial officers in Cleveland—this Court, the Bankruptcy Court, or a Magistrate appointed as Special Master—would be most familiar with White's byzantine financial structure, the courts where the suits were originally brought would be most familiar with the state products liability law under which the cases will be tried.

Moreover, it is only in those courts that all defendants could be tried together. Because there are multiple defendants in many of these actions, most of the various state and federal courts will continue to hear actions against co-defendants and insurers even if White's own liability is adjudicated in this district. In *Northern Pipeline,* the plurality opinion noted that "one of the express purposes of the [1978] Act was to ensure adjudication of all claims in a single forum and to avoid the delay and expense of jurisdictional disputes." 485 U.S. at 87 n. 40, 102 S.Ct. at 2880 n. 40. But complex tort cases like these do not lend themselves to consolidation in the bankruptcy forum.[9] Rather, only the courts of origin could adjudicate the claims against all defendants in one proceeding.

### 2.

Related to the claimants' right to an expeditious hearing is their possible right to a jury trial. This Court noted earlier that "[t]he product liability claims to be resolved against [White] ..., like the contract and warranty claims in *Northern [Pipeline* ], involve 'counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789 ...' No

---

**8.** Those plaintiffs who, quite understandably, cannot fathom how a lawsuit filed in Massachusetts, Pennsylvania or Texas has been frozen in Ohio for three-and-a-half years might well concur with Dickens' vision of Victorian "justice":

> This is the Court of Chancery; which has its decaying houses and its blighted lands in every shire; which has its worn-out lunatic in every madhouse, and its dead in every churchyard; which has its ruined suitor, with his slipshod heels and threadbare dress, borrowing and begging through the round of every man's acquaintance; which gives to monied might the means abundantly of wearying out the right; which so exhausts finances, patience, courage, hope, so overthrows the brain and breaks the heart, that there is not an honourable man among its practitioners who would not give—who does not often give—the warning, "Suffer any wrong that can be done you rather than come here!"
>
> \* \* \* \* \* \*
>
> Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in course of time, become so complicated that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two Chancery lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises....

C. Dickens, *Bleak House* 2–3 (1953 ed.).

**9.** As one commentator has noted:

> ... [I]f the bankruptcy court were to estimate claims individually, a sort of mass mitosis would occur, splitting each of the ... claims into two components and requiring two separate courts to consider each claim. The result would be a multiplicity of suits and a massive waste of judicial resources....
>
> Considerations of "fairness to litigants" also weigh heavily against the estimate of individual claims by the bankruptcy court. The estimation of each individual claim would place an intolerable burden on the plaintiffs, who would be forced to pursue suits simultaneously in two separate forums, perhaps thousands of miles apart. Moreover, the plaintiffs would be faced with the prospect of inconsistent judgments on a single claim. Plaintiffs winning jury verdicts against ... codefendants would understandably feel cheated if a panel of experts in the bankruptcy court gave them either no award against [the debtor] or an award much smaller than they could have expected from a jury.

Note, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings,* 96 Harv.L.Rev. 1121, 1139 (1983) ["Harvard Note"].

method of adjudication is hinted, other than the traditional common law mode of judge and jury ...'" *Citibank, N.A. v. White Motor Corporation, supra,* 23 B.R. at 279, quoting *Northern Pipeline, supra,* 458 U.S. at 90, 102 S.Ct. at 2881 (Rehnquist, J., concurring). Under interim rule (d)(3)(A), however, the cases before this Court are not "*Northern Pipeline* caes"—"related proceedings" which are "brought by an estate against parties who have not filed claims against the estate."[10] They are therefore cases in which bankruptcy judges may enter final judgments under interim rule (d)(2), even though interim rule (d)(1)(D) forbids bankruptcy judges from conducting jury trials.

Notwithstanding the Sixth Circuit's holding that the interim rules are constitutional, its *Citibank* opinion does not offer a definitive answer to the question of whether 28 U.S.C. § 1480(a) provides the products liability plaintiffs a right to a jury trial. That subsection provides:

> Except as provided in subsection (b) of this section, this chapter and Title 11 do not affect any right to trial by jury, in a case under Title 11 or in a proceeding

arising under Title 11 or arising in or related to a case under Title 11, that is provided by any statute in effect on September 30, 1979.

The clearest lesson to be drawn from the provision and its legislative history is that "whether particular proceedings will be characterized as in equity or at law, depending on their nature, will determine the future of juries in the bankruptcy court." 1 *Collier on Bankruptcy,* ¶ 3.01[4][i] (15th ed. 1982). Early cases under § 1480(a) have not elaborated much on this explanation, and neither cases decided under the old Bankruptcy Act,[11] *Northern Pipeline,* nor the recent cases concerning the constitutionality of proceedings conducted by federal magistrates [12] definitively resolve the issue.

In short, there is a substantial question as to whether the claimants in these cases have a right to a jury trial. Any plan for resolving these cases that grants or denies them a jury trial raises constitutional issues justifying a non-frivolous appeal. The mandate from the Sixth Circuit, however, does not require a decision on the issue at

---

**10.** Interim rule (d)(3)(A) states clearly: "A proceeding is not a related proceeding merely because the outcome will be affected by state law."

**11.** *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), held that "bankruptcy courts have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession, ... and as the proceedings of bankruptcy courts are inherently proceedings in equity, ... there is no Seventh Amendment right to a jury trial for determination of objections to claims ..." *Id.* at 336–37, 86 S.Ct. at 476–77.

In *Katchen,* however, the Court explicitly limited its opinion to the bankruptcy court's summary jurisdiction to order the surrender of voidable preferences asserted and proved by the trustee in response to a claim filed by the creditor who received the preference. It did not overrule the doctrine of *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), that cases presenting mixed issues of law and equity must have their legal aspects tried to a jury, even if there has been a prior determination of the equitable aspects. *Katch-*

*en* can hardly be said to be dispositive of the issue before this Court under the new Code. *See* Levy, *Trial by Jury Under the Bankruptcy Reform Act of 1978,* 12 Conn.L.Rev. 1 (1979).

**12.** The cases involving the Federal Magistrates Act of 1979 are informative, however, with respect to Article III problems posed by proceedings before a bankruptcy judge or magistrate. While *Pacemaker Diagnostic Clinic of America v. Instromedix, Inc.,* 712 F.2d 1305 (9th Cir.1983) (§ 636(c) of Act unconstitutional under *Northern Pipeline* even where parties consented to trial of patent case before magistrate), *argued en banc,* 725 F.2d 537 (9th Cir. 1983) and *Wharton-Thomas v. United States,* 721 F.2d 922 (3d Cir.1983) (§ 636(c) constitutional where parties consented to trial of Federal Tort Claims Act by magistrate) disagree over the *per se* unconstitutionality of proceedings conducted by non-Article III federal magistrates, both cases stand for the proposition that unconsented-to trials before magistrates pose serious, perhaps insurmountable, constitutional problems. *See also Heckers v. Fowler,* 69 U.S. (2 Wall.) 123, 128, 17 L.Ed. 759 (1864) (not unconstitutional for parties to agree to refer case to referee and further agree "that the report of the referee have the same force and effect as a judgment of the court").

this time, and this Court, in its discretion, declines to set forth any opinion in this extremely complicated area. Nevertheless, the jury trial issue merges with the need to resolve these cases expeditiously, for to remand parties who are not willing to waive their jury demand to the Bankruptcy Court or a Magistrate would be tantamount to holding that they have no right to a jury trial, and would precipitate months of delay while the appeal is heard.[13]

**C.**

Upon consideration of these competing equities, this Court has determined that those claimants who wish to proceed in the courts where they filed their cases should be allowed to do so.

Because of the possibility that the Seventh Amendment guarantees the products liability plaintiffs the right to demand a jury trial, these cases cannot be assigned directly to the Bankruptcy Court or to a Magistrate without creating grounds for an appeal that will delay resolution of these cases by months or even years. Only two of the four options proferred by the Sixth Circuit protect this right: trial before this Court or trial before the courts of origin, which are state courts or Article III federal district courts sitting pursuant to their diversity jurisdiction.

There can be little doubt that the courts of origin can resolve these cases more swiftly and efficiently than this Court could. All the proceedings before the cases were stayed took place in those courts; this Court, on the other hand, has for the most part dealt with the cases only collectively or in the abstract, and is not intimately familiar with the specific claims being raised. Similarly, the judges in the courts of origin are familiar with the diverse state products liability statutes and common law that will govern these cases; this Court is familiar only with the federal law governing White's reorganization, and with the Ohio law that governs only a few of the cases. Additionally, those courts can try all the defendants in one proceeding, and none of those courts will have to try more than a few of these cases; in this Court, where there were 474 pending civil cases and 14 pending criminal cases as of January 31, 1984, it would take years to try the dozens of pre-petition and post-petition products liability cases. Finally, the evidence, witnesses, and counsel are, for the most part, located in the cities where the claims arose. This is true of all parties, not just the plaintiffs, since in product liability cases White is represented by local counsel, not by the Cleveland and New York corporate counsel who have orchestrated its reorganization proceedings.

The claimants may, therefore, pursue their claims in the courts of origin. If successful, they may collect judgments in accordance with the procedures set forth in Part IV, *infra.*

**III.**

This Court must now deal with White's contention that the Code bars implementation of the sensible approach outlined above. White's arguments are not persuasive.

**A.**

White states that "[a]s a result of the discharge granted by Section 1141 and the statutory injunction imposed by Section 524 of the Bankruptcy Code, ... the pre-confir-

---

13. The effect of estimating individual claims in the bankruptcy court would be to deny plaintiffs the juries to which they would be entitled in other courts. This denial cannot be justified by the policy underlying the absence of a jury right in the typical bankruptcy case—freeing the bankruptcy court to carry out its mission quickly and efficiently.... [T]he bankruptcy court would promote neither efficiency nor any other policy of the Bankruptcy Code by estimating individual claims itself.

Harvard Note, *supra* note 9, at 1141. *See also Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134, 135 (3d Cir.1982) ("It is conceivable that in rare or unusual cases arbitration or even a jury trial may be necessary to obtain a reasonably accurate evaluation of the claims"), citing 3 *Collier on Bankruptcy* ¶ 502.03 (15th ed. 1981); *cf.* Olick, *Chapter 11—A Dubious Solution to Massive Toxic Tort Liability,* 18 Forum 361 (1982).

mation product liability cases against it can proceed only against the assets held by the WMC Reorganization Trust pursuant to the terms of Article X of the plan of reorganization and through proceedings on a timely filed proof of claim. Proceedings on proofs of claim, pursuant to Section 502 of the Bankruptcy Code, can take place only in connection with the Chapter 11 reorganization proceeding." Supplemental Brief of White Motor, at 7–8. An appropriate response to this argument requires close textual analysis of Chapter 11.[14]

The first part of White's argument is that § 1141 discharged all products liability claims that were pending against it on November 18, 1983, when the Bankruptcy Court confirmed the Plan. Section 1141(d)(1) describes the effect of confirmation as follows:

> Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
>
> (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h) or 502(i) of this title, whether or not—
>
> (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;
>
> (ii) such claim is allowed under section 502 of this title; or
>
> (iii) the holder of such claim has accepted the plan....[15]

It is abundantly clear that, as confirmed by the Bankruptcy Court and this Court, the White Plan "otherwise provides" for the products liability claims and does not discharge them. In its "Application for Approval of Reduced Reserves for Certain Product Liability Claims" ("Application"), which the Bankruptcy Court approved concurrently with the Plan on November 18, 1983, White represented that the Plan left intact liability insurance of approximately $60 million for each year relevant to the products liability and related claims, and provided a $4.2 million Reserve Fund to pay, on a *pro rata* basis, that portion of any judgment against White not covered by insurance. The representations made in the Application must be read together with the contents of the Plan, just as the simultaneous orders confirming the Plan and approving the Application must be read together.

In the Application, White made the following representations about its insurance coverage:

> 7. White Motor has, at all pertinent times, maintained liability insurance covering product liability and related claims.... Such coverage has been provided through a combination of insurance policies, including a base level policy and one or more excess liability policies (the "Policies"). The aggregate annual limits under the Policies have totaled, during the pertinent periods, approximately $60,000,000 for each policy year.
>
> 8. Subsequent to June 1, 1982, White Motor's Policies provide what is known as "first dollar coverage." Under such coverage, White Motor is, to the maximum limit of the Policies, protected against all economic risk incident to product liability

---

**14.** Parsing the language of an individual Code provision is a frustrating endeavor:

> The statutory structure of the new Act raises the image of a classical Elizabethan labyrinth. Like the Internal Revenue Code, convoluted sentences are combined with mysterious cross-references that defy any simple answer to the question, "What does this mean?"

Aaron, *The Bankruptcy Reform Act of 1978: The Full-Employment-for-Lawyers Bill, Part V: Business Reorganization,* 1982 Utah L.Rev. 1, 39–40.

**15.** The legislative history of the provision states:

> Subsection (d) contains the discharge for a reorganized debtor. Paragraph (1) specifies that the confirmation of the plan discharges the debtor from any debt that arose before the date of the order for relief unless the plan or the order confirming the plan provides otherwise. The discharge is effective against those claims whether or not proof of the claim is filed (or deemed filed), and whether or not the claim is allowed.

Senate Report at 129; 1978 U.S.Code Cong. & Admin.News at 5915.

claims. Second, for occurrences prior to January 1, 1975, White Motor has exhausted any retained exposure applicable under its Policies....

9. With respect to occurrences during the period from January 1, 1975 through May 31, 1982, the various Policies provide for a specified "self-insured retention." Such self-insured retention ("S.I.R.") functions similar [sic] to an insurance deductible in that White Motor retains liability for a specified dollar amount applicable to each occurrence and subject to an annual aggregate maximum of retained liability [of $1,250,000 per year for 1975 through 1977, $2,500,000 per year for 1978 through 1980, and $1,250,000 per year for the period from January 1, 1981 through May 31, 1982].... When the S.I.R. limits are exhausted, either for a single occurrence or for an annual aggregate, insurance takes over for any remaining liability....

The S.I.R., or deductible, is covered by the Reserve Fund created by Article X of the Plan. The Bankruptcy Court approved White's proposal:

11.... that a cash reserve of $4,281,124 be established by it pursuant to Article X of the Plan with respect to the S.I.R. exposure pertaining to the Claims pertaining to the occurrences during the period January 1, 1975 through May 31, 1982. Such a reserve reflects treatment of such claims under the classifications for which they have been filed, up to their pro rata share of White Motor's maximum remaining S.I.R. liability.... In addition, the proposed reserve includes an unallocated contingency amount of approximately $1,500,000. This additional amount reflects the potential for the existence of filed product liability and relat-

ed claims which have not been discovered and identified by White Motor as such, the potential for the allowance of late-filed claims and the potential for amendment by holders of Claims to the amounts or classifications previously asserted by them.

These provisions are consistent with White's longstanding and numerous representations to this Court that, with only a few exceptions,[16] White's estimates are based on the full amount *claimed* by both pre-petition and post-petition plaintiffs, rather than on a more realistic lower figure apt to be awarded, regardless of the forum in which the contingent claims are actually litigated. This Court relies on statements of White's counsel made just last month:

MR. MEYER: * * *

The face of a proof of claim in a product liability claim does not take account of the insurance.

\* \* \* \* \* \*

All the other claims with respect to the product liability are reserved as they are filed, and take into account the fact of the insurance payable, so except for Miller, every other product liability claim, if they were all allowed in the full amount, they are set for their money in the reserve, the four million, and the insurance, and they would be paid in full.

THE COURT: When you are saying "They would be paid," these are Class 2 creditors?

MR. MEYER: Commensurate treatment. What they would get is Class 2 treatment, and we estimate that to be—it is 41 so far, and we estimate it will end up about 50.

16. In paragraph 12 of the Application, White states that a $100 million pre-petition claim by Ronna C. Miller and post-petition claims by Duvernay, Dunnaway, Falgoust, Moore, Babb, and the Cummins Engine Company, "have been asserted for amounts which are grossly excessive and bear no possible relationship to the maximum likely award on such Claims." At a hearing on February 8, 1984 on Duvernay's Motion to Clarify, counsel for Duvernay

agreed that the $43 million claim was indeed exaggerated.

The Bankruptcy Court approved the reduction of the Reserve Fund to a level White conceded to be insufficient to meet the face value of those particular claims. The Bankruptcy Court's action, however, in no way operates to exclude Miller and Duvernay, *et al.* from sharing in the Reserve Fund.

*United States of America v. White Motor Corporation, supra* (transcript of Jan. 12, 1984, at 24–25).[17]

The Plan sets aside the insurance policies and the Reserve Fund from the moneys deemed essential for the start-up of the new, reorganized entity fashioned from White's remnants, Northeast Ohio Axle, Inc. ("NEOAX"). This Court's interpretation of § 1141 does not allow claimants to sue NEOAX and in no way interferes with the Code's policy to provide NEOAX with "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of existing debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). It is clear that the Plan and Confirmation Order "otherwise provide" for payments from the insurance policies and the Reserve Fund. White's representation that $4.2 million is a large enough Reserve Fund to cover all of the S.I.R. relating to the products liability claims was the basis for the Bankruptcy Court's decision to approve the Application and permit the Reserve Fund for product liability claims to be reduced from $68 million. It is totally inconsistent for White to now argue that the Reserve Fund and the insurance policies are insufficient to protect NEOAX from financial exposure. Accepting White's previous contentions, and believing that after confirmation "the reorga-

nized entity is insulated from being pursued by creditors who formally asserted non-dischargeable claims",[18] this Court holds that § 1141(d)(1) does not bar actions—on pre-petition or post-petition claims—to collect from the insurance policies, the Reserve Fund, or White's co-defendants.

B.

1.

White also contends that all the products liability actions are barred by the discharge injunction of 11 U.S.C. § 524(a). Under the Code, a discharge under § 1141(d)(1) transforms the § 362(a) automatic stay into a permanent injunction.[19]

Section 524(a) provides:

(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . .

---

**17.** At the February 8, 1984 hearing, this Court learned for the first time that some of White's insurers disclaim a portion of the insurance coverage which White contends it carries. At the hearing, White represented that it had only recently learned of this dispute and that the Bankruptcy Court would be asked to resolve the issue.

Also on February 8, the Ideal Mutual Insurance Company and Northbrook Excess and Surplus Insurance Company filed a Motion to Intervene. By endorsed order, this Court today denies the Motion as untimely and inappropriate.

**18.** Hopper, *Confirmation of a Plan Under Chapter 11 of the Bankruptcy Code and the Effect of Confirmation on Creditors' Rights,* 15 Ind.L.Rev. 501, 514 (1982).

**19.** The process is described in Rendleman, *The Bankruptcy Discharge: Towards a Fresh Start,* 58 N.Car.L.Rev. 723, 750–51 (1980):

Congress replaced the automatic stay rule with a broader statute, coordinated the discharge injunction with the automatic stay, and expanded the conduct forbidden by the automatic and the discharge injunction. When the debtor files bankruptcy, each creditor receives a stay that forbids the creditor from suing, repossessing, and perfecting or enforcing liens, and from "any act to collect, assess, or recover a [prebankruptcy] claim." Unless removed by the bankruptcy court, this stay lasts until it is replaced by the discharge injunction. The discharge releases the bankrupt from discharged debts, voids all judgments on discharged debts, and enjoins conduct inconsistent with the discharge. The injunction under the 1970 amendments only forbade creditors from "instituting or continuing any action or employing any process." The 1978 Code broadens the interdiction to ban also "any act, to collect, recover or offset any such debt as a personal liability of the debtor." (Footnotes omitted).

White argues that the Confirmation Order: (1) terminated the § 362 automatic stay with respect to pre-petition claims, replacing it with a § 524 injunction; and (2) also imposed a § 524 injunction with respect to post-petition, pre-confirmation claims, notwithstanding the Bankruptcy Court's refusal to extend the § 362 stay to those claims. *See* Order of April 5, 1983.

The second contention is frivolous and meritless. The legislative history indicates that the injunction and discharge is directed solely toward pre-petition debts:

> ... Subsection (a) specifies that a discharge in a bankruptcy case voids any judgment to the extent that it is a determination of the personal liability of the debtor with respect to a *prepetition* debt, and operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, ... to collect, recover or offset any discharged debt as a personal liability of the debtor ... (Emphasis supplied.)

S.Rep. at 80; 1978 U.S.Code Cong. & Admin.News at 5866 (emphasis added). *See also In re Amatex Corporation*, 30 B.R. 309, 315 (Bkrtcy.E.D.Pa.1983) ("By defining the terms 'creditor', 'claim', and 'debt' to be coextensive, Congress clearly intended that only prepetition claims could be affected by bankruptcy proceedings.")

The facts of this case render § 524 inapplicable to the pre-petition claims as well because the discharge injunction (1) is only triggered by a § 1141 discharge, which, because the Plan "otherwise provides", has not taken place with respect to the products liability claims; and (2) operates as an injunction only against suits which attempt "to collect, recover or offset any such debt as a personal liability of the debtor or from the property of the debtor ...", 11 U.S.C. § 524(a)(2), which is not the case with respect to these claims. That is, even if the § 1141 discharge were applicable to these products liability cases, § 524 does not enjoin them because any judgment against White will not result in personal liability to NEOAX; rather, White's insurers, its co-

defendants, and the Reserve Fund will be responsible for such liability.

Section 524 is limited to actions which affect the reorganized debtor personally. Subsection 524(e) expressly provides that "... discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." This expresses a policy complementing that of § 362(a), which is that co-defendants and insurers are not the intended beneficiaries of the automatic stay granted to the reorganizing debtor. In *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 544 (and cases cited therein), *vacated in part on other grounds*, 706 F.2d 548 (5th Cir.1983), the Eleventh Circuit held that applying the stay to co-debtors neither provides the debtor with a "breathing spell", nor assists in "preventing a race for the debtor's assets". *Id.* at 544. And the court in *Lynch v. Johns-Manville Sales Corp.*, 23 B.R. 750 (S.D.Ohio 1982), *aff'd*, 710 F.2d 1194 (6th Cir.1983) observed:

> ... We conclude that it would distort congressional purpose to hold that a third party solvent co-defendant should be shielded against his creditors by a device intended for the protection of the insolvent debtor.
>
> It is settled law that the automatic stay of section 362(a) does not operate against sureties, guarantors, or co-obligors of the Chapter 11 debtor.... It is surely both illogical and inequitable to provide the solvent products liability co-defendant with the protection of section 362(a) when that same protection is unavailable to the surety, guarantor or co-obligor of the insolvent co-defendant.

*Id.* at 753 (citations omitted).

The *Wedgeworth* court also refused to extend the S362 stay to insurers. It stated:

> We cannot read the language of § 362(a)(1), "against the debtor," as including the debtor's liability insurers. Nor does any other provision of § 362 grant the insurer an automatic stay. Section 362 ... provides a narrow protection directed at the debtor and its estate. Those interests are not automatically im-

pinged by suit against the debtor's liability insurer in an instance in which the payment by the insurer cannot inure to the debtor's pecuniary benefit. Such is the situation in the case at bar. A payment by the liability carrier will neither enhance nor decrease the bankruptcy estate.

706 F.2d at 547.[20]

*Wedgeworth* is more relevant to the insurance issues in this case than is *Johns-Manville v. Asbestos Litigation Group (In re Johns-Manville Corporation),* 26 B.R. 421 (Bkrtcy.S.D.N.Y.1983). In that reorganization proceeding, all suits against Manville's insurers were stayed because "Manville's rights under its insurance policies and all the causes of action arising thereunder constitute property of the Manville estates within the purview of Section 541(a) of the Code." At the time Manville filed its Chapter 11 petition, claims alleging more than $216 million in damages were pending and Manville estimated that it faced some 32,-000 additional suits involving not less than $2 billion in liability. 26 B.R. at 422, 435. The court feared that judgments against the insurers would "frustrate prompt and effective formulation of a plan of reorganization" and interfere with efforts to "insure uniform treatment of all asbestos-related health claimants." *Id.* at 436–37.

This case is much different. The reorganization is complete; NEOAX was created and sent off into the business world without need for the insurance or Reserve Fund moneys. Furthermore, claimants—parties who have filed lawsuits, proofs of claim, or both—have been identified, and the list is not subject to any major future expansion

by "latent claimants". Finally, White has represented that the insurance policies and the Reserve Fund are sufficient to compensate the claimants. In short, none of the unique circumstances which justified judicial protection of Johns-Manville's insurers apply to White's carriers.

It is clear, then, that § 524 poses no barrier to products liability suits against White's insurers and co-defendants. It is also clear that such suits could continue in their place of origin. *Matter of Holtcamp,* 669 F.2d 505, 508 (7th Cir.1982); *Jessie v. Honosky (In re Honosky),* 6 B.R. 667, 669 (Bkrtcy.S.D.W.Va.1980); Senate Report at 50; 1978 U.S.Code Cong. & Admin.News at 5836.[21]

■ Section 524 is limited to actions which personally affect the debtor and "[T]he injunction is only required when the continuance of a civil suit will result in efforts to collect from the debtor or his property in a judgment award." *In re McGraw,* 18 B.R. 140, 143 (Bkrtcy.W.D.Wis. 1982). As discussed above, neither the White estate nor the fledgling NEOAX are the targets of these products liability actions. The suits will proceed against White, its co-defendants and its insurers. Any judgment against White, however, will not be immediately payable. It will merely enable plaintiffs or co-defendants to receive insurance funds and then, provided that a timely proof of claim has been filed or deemed filed, seek to recover their *pro rata* share from the Reserve Fund, as administered by the Bankruptcy Court. In short, absent any personal liability on the debtor, § 524 is inapplicable and does not bar these suits from proceeding.

---

**20.** While the court later vacated that portion of its opinion concerning direct action against the insurers, 706 F.2d at 548, it merely held "that the district court did not abuse its discretion in declining to permit the plaintiffs to amend their complaints to add, as party defendants, the liability insurance carriers . . .", and in no way repudiated the discussion quoted above.

**21.** *See also* 2 *Collier on Bankruptcy* ¶ 362.07 (15th ed. 1982):

. . . Generally, proceedings in which the debtor is a fiduciary or which involve the post-pe-

tition activities of the debtor need not be stayed since they bear no real relationship to the purpose of the stay which is to protect the debtor and the estate from creditors. Where the claim is one covered by insurance or indemnity, continuation of the action should be permitted since hardship to the debtor is likely to be outweighed by hardship to the plaintiff. Finally, the liquidation of a claim may be more conveniently and speedily determined in another forum. (Footnotes omitted).

**2.**

■ Even if § 524(a) is applicable, it appears that this Court has the power to modify the injunction and allow these cases to proceed for the limited purpose of fixing liability and collecting from all co-defendants and entities other than NEOAX. *In re McGraw, supra,* 18 B.R. at 243; *Jessie v. Honosky, supra,* 6 B.R. at 669–70. White argues that the injunction under § 524(a) cannot be modified because there is no provision for modification comparable to § 362(d), which allows the automatic stay under § 362(a) to be lifted or modified. It contends that if Congress had intended to permit modifications of § 524(a), the section would contain a counterpart to § 362(d). This Court is not convinced that Congress was so omniscient. Rather, § 524 must be read in conjunction with the overall purposes of the Code. Chapter 11 seeks to free a beleaguered debtor from harassing creditors' attempts to collect on debts which have been discharged, and to protect the reorganized company's assets. Merely requiring White to assume responsibility for its alleged tortious acts—and to do so for the limited purposes of fixing liability without a right of collection against NEOAX's assets—is not inconsistent with these purposes.

Accordingly, this Court finds that the provisions of § 524 do not bar further proceedings in state courts and other federal courts, subject to the limitations set forth below.

### IV.

In light of the conclusions of law enunciated above, this Court, pursuant to the mandate of the Sixth Circuit in *White Motor Corporation v. Citibank, N.A., supra,* orders the following disposition of products liability claims against White Motor Corporation and its affiliates:

(1) The automatic stay provided by 11 U.S.C. § 362 having terminated on November 18, 1983, and the discharge injunction of 11 U.S.C. § 524 being inapplicable to the claims before this Court, products liability cases may be resumed or continued in the appropriate state and federal courts, subject to the following restrictions:

(a) Within the limitations of the relevant state law, these actions may proceed to trial and judgments may be obtained against all appropriate parties, including White, White's co-defendants, and, where permitted, White's insurers.

(b) Within the limitations of the relevant state law, prevailing parties may collect judgments obtained against White's co-defendants and, where permitted, White's insurers. Prevailing parties may also collect that portion of any judgment against White which is covered by White's liability insurance policies. No party may collect any portion of any judgment against White which is not covered by such insurance policies, except as provided in paragraph (1)(c). No party may seek to execute any judgment against White by commencing any action against NEOAX.

(c) A party who obtains a final judgment against White, and who cannot collect the total amount of such judgment from White's insurance policies, may petition the Bankruptcy Court for payment from the Reserve Fund established by Article X of the Reorganization Plan. Such payment shall be made only if the party has filed or is deemed to have filed a timely proof of claim, or is hereafter permitted to file a late proof of claim, pursuant to 11 U.S.C. § 501. The Bankruptcy Court shall make payments on those claims in a manner consistent with the provisions of the Reorganization Plan, the Bankruptcy Code and this Opinion.

(2) Within the limitations of the relevant state and federal law, a party who has filed or is deemed to have filed a timely proof of claim, or is hereafter permitted to file a late proof of claim, pursuant to 11 U.S.C. § 501, but who has not commenced a civil action against White, its co-defendants and, where permitted, White's insurers, may do so in a state or federal court of appropriate jurisdiction within thirty (30) days of the date of this Opinion, except that where commencement of an action for contribution or in-

demnification by a co-defendant against White or, where permitted, White's insurers, is contingent upon entry of a final judgment in a pending action, such an action may be commenced in a state or federal court of appropriate jurisdiction within thirty (30) days after the entry of such judgment.

(3) Failure by a party to commence an action within the time limits set forth in paragraph (2) shall be deemed a waiver of any right to a trial by jury. The Bankruptcy Court shall then estimate the value of the proof of claim pursuant to 11 U.S.C. § 502(c), and shall make payments on those claims in a manner consistent with the provisions of the Reorganization Plan, the Bankruptcy Code, and this Opinion.

(4) Pursuant to interim rule (c)(2), and subject to such exceptions and limitations as this Court shall make, thirty (30) days following the date of this Opinion the products liability cases will be referred back to the Bankruptcy Court for proceedings not inconsistent with this Opinion.

(5) The decision of the Bankruptcy Court in *Larry and Brenda Moore v. White Motor Corporation,* Civil No. C83–1151, Misc. Nos. 83–11 and 83–311 (rendered prior to the establishment of the Reserve Fund and Article X, when different facts obtained and White was not representing, as it does now, that its insurance would pay product liability judgments and the Reserve Fund would absorb, *pro rata,* any remaining liability assessed against White) is reversed and judgment is entered for the plaintiff-appellant.

IT IS SO ORDERED.

### EXHIBIT 1

AmeriTrust Company

Bank of America N.T. & S.A.

Bank of Montreal

The Bank of New York

The Bank of Nova Scotia

Central National Bank of Cleveland

The Chase Manhattan Bank, National Association

Citibank, N.A.

Continental Illinois National Bank and Trust Company of Chicago

Crocker National Bank

European-American Bank & Trust Company

First National Bank in Dallas

The First National Bank in Dallas

The First National Bank in Atlanta

First National Bank of Minneapolis

First Security Bank of Utah, N.A.

Manufacturers Hanover Trust Company

Mellon Bank, N.A.

Michigan National Bank of Detroit

Michigan National Bank of Lansing

Morgan Guaranty Trust Company of New York

National City Bank (Cleveland)

North Carolina National Bank

Security Pacific National Bank

Society National Bank

Union Bank of Bavaria

Union Bank of Los Angeles

Union Commerce Bank